## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| KIMBERLY BARREN, | ) | |
| | ) | No. 13 CV 4390 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| NORTHEAST ILLINOIS REGIONAL | ) | |
| COMMUTER RAILROAD | ) | |
| CORPORATION, d/b/a METRA, | ) | |
| | ) | March 7, 2016 |
| Defendant. | ) | |

### MEMORANDUM OPINION and ORDER

Kimberly Barren brings this action against her employer, Northeast Illinois Regional Commuter Railroad Corporation ("Metra"), asserting claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601-2654, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* She also asserts a breach of contract claim. The parties have consented to this court's jurisdiction. (R. 21.) Before the court is Metra's motion for summary judgment. (R. 107.) For the following reasons, the motion is granted:

### Background

#### A.    Local Rule 56.1

Local Rule ("L.R.") 56.1 requires movants to provide statements containing specific references to supporting materials, and failure to comply with L.R. 56.1 is a sufficient ground for courts to strike or disregard unsupported facts. *See Ammons v.*

*Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004). Before reaching the merits of Metra's motion, the court first notes that there are several instances in the parties' L.R. 56.1 statements in which they fail to cite to supporting evidence or fail to controvert an asserted fact. For example, in its statement of facts Metra sometimes cites to portions of the record which appear wholly unrelated to the asserted fact, (see, e.g., R. 109, DSOF[1] ¶¶ 11-12, 17-18, 22, 30), or cites generally to an entire document without specific reference to which parts actually support the fact asserted, (see, e.g., id. ¶¶ 17, 19). Barren makes similar errors, citing to exhibits that either do not exist or do not support the fact asserted. (See, e.g., R. 128, Pl.'s Resp. to DSOF ¶¶ 18, 23, 32, 77; R. 129, PSOF ¶¶ 1, 9.) Barren's L.R. 56.1(b) statement of additional facts also falls short because in some instances she cites only to her own affidavit or deposition testimony without explaining how she is qualified to offer such testimony. (See R. 129, PSOF ¶¶ 2, 3, 11); *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir.2009) (in a motion for summary judgment, factual assertions must be competent evidence that is admissible at trial).

To the extent the parties' asserted facts are not properly supported, the court disregards them. *See Menasha Corp. v. News Am. Mktg. In-Store*, 238 F. Supp. 2d 1024, 1029 (N.D. Ill. 2003). Conversely, pursuant to L.R. 56.1(b)(3)(C), all material facts adequately set forth in Metra's statement which Barren does not properly controvert are deemed admitted. *See Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir.

---

[1] "DSOF" refers to Metra's L.R. 56.1(a)(3) statement of material facts, and "Pl.'s Resp. to DSOF" refers to Barren's response to Metra's L.R. 56.1(a)(3) statement of material facts. "PSOF" refers to Barren's L.R. 56.1(b) statement of additional facts.

2003); *Jankovich v. Exelon Corp.*, No. 01 CV 7436, 2003 WL 260714, at *5 (N.D. Ill. Jan. 31, 2003) (noting that evasive denials that do not directly oppose an assertion are improper and thus the contested facts are deemed to be admitted pursuant to L.R. 56.1). Similarly, because Metra did not respond to Barren's L.R. 56.1(b)(3) statement of additional facts, all properly supported facts therein are deemed admitted. *See* L.R. 56.1(a)(3). The following undisputed facts will be viewed in the light most favorable to Barren for purposes of ruling on Metra's motion. *See O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

**B.     Facts**

Barren, a black female, has worked for Metra as a trainman since May 2011. (R. 109, DSOF ¶ 4.) Trainmen, including conductors and assistant conductors, facilitate or supervise the movement of railroad equipment. (Id.) Barren's duties include collecting fare, working in rail yards, and working as a flagman. (See id.) As a member of the United Transportation Union ("UTU"), Barren is bound by a Collective Bargaining Agreement between UTU and Metra ("CBA"). (Id. ¶ 6.)

**1.     Efficiency Tests**

Metra conducts random "efficiency tests," during which supervisors question trainmen on various aspects of their job. (R. 109, DSOF ¶ 7.) During an efficiency test in October 2012, Supervisor Janet Carbonelli asked Barren to recite the emergency exit announcement which Barren was required to know. (Id. ¶¶ 9-10, 24-25.) She was unable to recite the announcement successfully at that time, (see id. ¶ 26), but was able to recite it during a subsequent re-test, (id. ¶ 28).

## 2.     Work Schedule

Under the CBA, seniority plays a significant role in how jobs are assigned to trainmen.  (See id. ¶¶ 12, 19.)  For example, a trainman with higher seniority can displace or "bump" a junior trainman from his or her assigned work schedule.  (See id. ¶ 19.)  When that happens, Metra's Crew Management Center ("CMC") calls the displaced trainman to notify her of the bump.  (Id.)  That trainman must then call the CMC "within six hours after being released from the last service which they performed."  (Id. ¶ 20.)  If the trainman does not call within six hours, she is assigned to the "extra board" and must be available during certain hours to receive work assignments.  (See id. ¶¶ 12, 21.)  Once a trainman is placed on the extra board, she cannot claim an assignment for 30 days unless an assignment is released or a new assignment is created.  (See id. ¶ 21.)

The CMC contacts trainmen using a Metra-issued Nextel telephone, pager, or cell phone.  (See id. ¶¶ 13-14.)  Because Metra requires trainmen to have a reliable means for the CMC to reach them, trainmen who use a cell phone as their primary means of contact must also provide a back-up number.  (Id. ¶¶ 14-15.)  Barren used her personal cell phone as a back-up means for the CMC to reach her.  (See id. ¶ 15.)  Trainmen are responsible for ensuring that their communication devices are in proper working order.  (Id. ¶¶ 14, 16.)  The failure of a trainman's communication device does not excuse her from responding to calls, and if the CMC leaves a voicemail with a trainman, she has 15 minutes to return the call.  (See id. ¶¶ 16-

17.) Under Metra's policy, failing to return a call within 15 minutes is considered "a violation of the schedule rules and agreement." (Id. ¶ 17; R. 113, Ex. 4 at 3.)

On November 5, 2012, Barren worked her scheduled shift from 5:07 p.m. until 12:26 a.m. the following morning. (R. 109, DSOF ¶ 34.) At 5:33 p.m., shortly after Barren started her shift, the CMC called Barren's Metra-issued Nextel phone and left a voicemail informing her that a more senior employee had bumped her from her assigned shift. (Id. ¶¶ 34, 36-37.) The CMC instructed Barren to return the call to select a new assignment. (Id. ¶ 37.) The CMC also called Barren's personal cell phone, but was unable to leave a message because Barren's voice-mailbox was full. (Id. ¶ 38.) Under the CBA, Barren had until about 6:26 a.m. on November 6, 2012—six hours after being released from her shift—to return the CMC's call. (R. 109, DSOF ¶ 20.)

The next morning at 9:20 a.m. on November 6, 2012, the CMC left another message at each of Barren's contact numbers to tell her that she had been bumped and that she should contact the CMC. (Id. ¶ 40.) Barren called the CMC about 40 minutes later, at 10:03 a.m., and inquired about available assignments. (Id. ¶ 41.) After hearing her options, Barren said she would call the CMC back. (Id. ¶ 42.) According to Metra's records, Barren again contacted the CMC later that afternoon at 2:18 p.m. to ask which assignments were available, and again said she would call back. (Id. ¶ 43.) A few hours later Barren reported to work for her previously assigned shift beginning at 5:07 p.m. on November 6, 2012. (Id. ¶ 44.) But she called the CMC around 5:30 p.m. after she realized that another conductor was

already working that shift, selected a new assignment, and then went home. (See R. 110, Barren Dep. Vol. I at 115:14-22; R. 109, DSOF ¶¶ 45-46; R. 128, Pl.'s Resp. to DSOF ¶ 46.) However, after conferring internally, the CMC determined that Barren had missed her six-hour window for choosing an assignment and called Barren at 6:02 p.m. to inform her that instead of working her new assignment, she would be placed on the extra board. (Id. ¶¶ 46-48.) Barren opposed her placement on the extra board and stated that she would work her chosen assignment instead. (Id. ¶ 49.) Barren did not work a shift that day. (R. 128, Pl.'s Resp. to DSOF ¶ 46.)

Barren then took a leave of absence on the following two days, November 7 and 8, 2012, then selected and worked a new assignment on November 9, 2012. (Id. ¶ 67.) Later that week Supervisor Carbonelli met with Barren and Barren's union representative. During that meeting Carbonelli informed Barren that the demands of her job as a trainman might occasionally prevent her from attending to personal matters. (See id. ¶ 62.) The following week, on November 15, 2012, Barren received two notices that she would be the subject of formal investigations. (See id. ¶ 65.) According to the CBA, the purpose of an investigation is to determine whether an employee violated Metra rules or policies, and if so, what discipline should be imposed. (See id. ¶ 64.) The two notices arose from her failure to return the CMC's call on November 5, 2012, and her alleged refusal to take an assignment from the extra board on November 7, 2012.[2] (Id. ¶ 65.) Barren filed a charge with

---

[2] Despite the fact that the notices were issued more than three years ago, these investigations have not occurred because Barren remains on medical leave. (Id. ¶ 70.)

the EEOC on November 16, 2012, alleging retaliation and discrimination on the basis of her race and sex. (See id. ¶ 68; see also R. 43, Def.'s Answer to Am. Compl. ¶ 39.)

### 3. FMLA Leave

Barren applied for intermittent FMLA leave to care for her daughter on February 18, 2012. (R. 109, DSOF ¶ 29.) Acting on advice from a reviewing physician, Metra's medical department requested additional documentation from Barren's daughter's treating physician. (Id.) On July 10, 2012, Barren filed a charge with the EEOC and the Illinois Department of Human Rights alleging race discrimination because Metra failed to approve her requests for FMLA leave. (See id. ¶ 30.) Metra and Barren mediated the dispute on September 5, 2012, and the next day, Metra approved Barren's request for intermittent FMLA leave from February 2012 to February 2013. (Id. ¶¶ 30-31.) The parties also signed a settlement agreement on October 2, 2012 ("Mediation Agreement"), in which Metra agreed, among other things, to: (1) issue "special written instructions" to the CMC regarding appropriate questions to ask an employee who is requesting FMLA leave; (2) schedule a discussion between Metra's medical department and Barren about each party's responsibilities regarding FMLA paperwork; and (3) remind the medical department that employees' medical issues are confidential. (See id. ¶ 30; R. 129, PSOF ¶¶ 16-20; R. 77, Suppl. Compl., Ex. 1 at 2-3.)

On September 28, 2012, after Metra had approved Barren's request for intermittent leave, Barren requested leave to care for her daughter. (R. 109, DSOF

¶ 33.) Because of a clerical error, however, the CMC did not have a copy of Barren's FMLA approval on file so it initially denied Barren's request for the day off. (Id.) But her request was eventually granted and Barren was not required to report to work, and Metra did not discipline her for taking leave that day. (Id.) On November 20, 2012, however, Metra denied Barren's request for FMLA leave to attend her own doctor's appointment because Barren's FMLA approval did not provide time off for such appointments. (Id. ¶ 69.) But Barren ultimately was given leave that day and was not subjected to discipline for taking the day off. (Id.)

The parties' L.R. 56.1 statements are unclear regarding what occurred in the period before and during the fall of 2013, but it is undisputed that from at least September 2013 through November 2013, Barren was placed on medical leave. (See id. ¶ 75.) Barren alleges that during that time, Metra's medical department "falsely reported" to the benefits department that she would return to work on October 2, 2013, even though Barren's physician submitted paperwork noting a return date of November 13, 2013. (See R. 41, Am. Compl. ¶¶ 44-45.) According to Barren, this caused her disability benefits to be unduly delayed. (Id. ¶ 46.) Barren filed a third EEOC charge on October 31, 2013, alleging retaliation and discrimination on the basis of her disability. (See id. ¶ 49.)

### 4. Medical Disqualification

Metra's practice is to evaluate employees for "medical disqualification" after they have been on medical leave for approximately one year. (R. 109, DSOF ¶ 78.) If medically disqualified, an employee no longer has to periodically submit medical

paperwork to Metra's medical department to justify their continued leave of absence. (See id. ¶ 80.) Before designating an employee as medically disqualified, Metra's Chief Medical Officer ("CMO") reviews the employee's medical documentation to determine whether she is medically capable of performing her job. (Id. ¶ 79.) The parties do not dispute that medical disqualification has no adverse impact on the employee's status—the employee is not terminated, continues to accrue seniority, and suffers no loss of benefits. (Id. ¶ 82.) If the employee recovers from her medical condition, she can return to work as long as she passes a physical examination performed by Metra's CMO. (Id. ¶ 81.) According to Barren, Metra placed her on medically disqualified status on November 20, 2013. (R. 41, Am. Compl. ¶ 50.) Barren filed her fourth EEOC charge on November 26, 2013, this time alleging retaliation and discrimination on the basis of her race, sex, and disability. (Id. ¶ 52.)

## Analysis

Summary judgment is appropriate if the moving party shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. Although the facts will be viewed in Barren's favor, she "is not entitled to the benefit of inferences that are supported by only speculation or conjecture." *See Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 599 (7th Cir. 2014) (internal quotation omitted). The court's role at this stage is not to "weigh the evidence or engage in fact-finding," but rather to "simply determine whether there is a genuine issue for trial." *Hasan v. Foley & Lardner*

*LLP*, 552 F.3d 520, 527 (7th Cir. 2009). A genuine issue of material fact exists if "'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Hnin v. TOA (USA), LLC*, 751 F.3d 499, 504 (7th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## A.   Race and Sex Discrimination Claims

Discrimination and retaliation claims are analyzed under the direct and indirect methods of proof. *See Orton-Bell v. Indiana*, 759 F.3d 768, 773 (7th Cir. 2014). Because Barren bases her race and sex discrimination claims on the indirect method, (see R. 41, Am. Compl. at 10-11; R. 127, Pl.'s Resp. at 3-5), this court will apply that framework in its analysis. Under the indirect method of proof, Barren has the initial burden of making out a prima facie case that: (1) she is a member of a protected class; (2) she performed according to Metra's reasonable expectations; (3) she nonetheless suffered an adverse employment action; and (4) similarly situated non-black or male employees were treated more favorably. *See Morgan v. SVT, LLC*, 724 F.3d 990, 996 (7th Cir. 2013). If Barren is able to satisfy these criteria, the burden shifts to Metra to offer a non-discriminatory reason for the claimed adverse employment action. *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012). If Metra does so, the burden shifts back to Barren to present evidence that Metra's explanation for the challenged action is nothing more than a pretext for discrimination. *See id.*

The parties focus primarily on whether Barren suffered an adverse employment action, so the court's analysis begins there. In the context of a

discrimination claim, an adverse employment action must represent a "materially adverse change," such as "a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 612-13 (7th Cir. 2001) (internal quotations omitted). Barren concedes that she was never terminated, pulled from service, disciplined, suspended, or demoted. (R. 109, DSOF ¶ 5.) Rather, Barren argues that she suffered adverse actions in the form of denied requests for FMLA leave, a delay in receiving disability benefits, being the target of formal investigations, having to recite an emergency exit announcement, being placed on medical disqualification status, and losing the ability to secure a shift of her choice. (R. 127, Pl.'s Resp. at 5; R. 41, Am. Compl. ¶¶ 57, 62.)

Barren's arguments fall short for a number of reasons. Regarding her requests for FMLA leave, Barren does not dispute that she eventually received approved time off from work for the days she claims Metra denied her leave, (R. 109, DSOF ¶ 33, 69), and she fails to present any evidence to show that Metra's initial denials resulted in any materially adverse change to the terms and conditions of her employment. Nor has Barren presented sufficient evidence that she experienced a delay in receiving disability benefits. She asserts that she "provided copies from AFLAC" that show "changes" in her benefits as a result of Metra's medical department paperwork. (R. 128, Pl.'s Resp. to DSOF ¶ 77.) But she only cites her own affidavit for this conclusion, which simply repeats her

assertion and includes no supporting documentation showing the existence or extent of any such delay. As the Seventh Circuit has put it, "summary judgment is the put up or shut up moment in a lawsuit." *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008). If Barren has documents indicating that her insurance benefits were withheld or reduced, this was the time to present them. Furthermore, even if Barren is able to show that her benefits were delayed, it is unlikely that such delay would rise to the level of an adverse employment action. *See Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 301 (7th Cir. 2004) (finding a two-month delay in payment was a mere inconvenience, not an adverse employment action) (citations omitted).

As for the internal investigations, Metra points out that the investigations have not yet occurred and there is no indication that the mere prospect of these investigations has affected Barren's employment in any material way. (See R. 109, DSOF ¶ 70); *see also Holt v. Pennsylvania*, No. 10-5510, 2015 WL 4944032, at *21 (E.D. Pa. Aug. 19, 2015) (noting that initiating an investigation was not sufficiently adverse "insofar as it is simply a request for the employer to determine whether an employee has violated its policies and is in need of discipline"). Similarly, there is no evidence in this case that failing the efficiency test had any impact on Barren's employment and any alleged reprimand for failing the test would be insufficient by itself to constitute an adverse employment action. *See Grube v. Lau Indus., Inc.*, 257 F.3d 723, 729 (7th Cir. 2001) ("unfair reprimands or negative performance evaluations, unaccompanied by some tangible job consequence, do not constitute

adverse employment actions"). Barren admits that all trainmen are required to know the emergency exit announcements, (R. 109, DSOF ¶ 10), and does not allege that any disciplinary action was taken as a result of the failed test.

Barren's medical disqualification status also has no adverse impact on the terms of her employment. (Id. ¶ 82.) In fact, a medically disqualified employee no longer has to periodically submit medical paperwork to Metra's medical department to justify their continued medical leave of absence. (See id. ¶ 80.) Although Barren alleges in her complaint that being medically disqualified prevents her from returning to her position, she now concedes that if she recovers from her medical condition, she can return to work as long as she passes a physical examination. (Id. ¶ 81.)

Next, Barren has not presented evidence indicating that her inability to secure a shift of her choice constitutes an adverse employment action. The inability to work a particular schedule generally does not amount to an actionable adverse employment action. *Peters v. Wal-Mart Stores East*, LP, 512 Fed. App'x 622, 626 (7th Cir. 2013) (citing *Porter v. City of Chi.*, 700 F.3d 944, 955 (7th Cir. 2012)); *Grube*, 257 F.3d at 729-30 (transfer to the second shift was not an adverse employment action). Furthermore, Barren was allowed to choose a shift on November 9, 2012, after having spent less than four days on the extra board. (See R. 129, PSOF ¶ 6.) She does not argue that her change in shift had material consequences or that her new shift is somehow inferior to her previous one.

Therefore, Barren has not submitted sufficient evidence from which a reasonable jury could find that her schedule change was materially adverse.

Barren's remaining argument that her wage loss from November 6, 2012, qualifies as an adverse employment action is more persuasive. According to the CBA, someone who chooses to bump another employee must inform the proper authority in sufficient time to permit the displaced trainman to receive notification of the bump prior to the end of her assignment. (See R. 113-2, Ex. 5 at 11.) If the bumped trainman does not exercise her right to choose an available assignment within six hours "after being released from the last service which [she] performed," she is then placed on the extra board. (R. 113-2, Ex. 5 at 11.) Metra argues that Barren missed her six-hour window because the CMC notified her via voicemail during her shift on November 5, 2012, but she failed contact the CMC until about twenty four hours later. (R. 108, Def.'s Mem. at 4.) Barren says she never received those voicemails and contends that because Metra did not provide her with actual notice before her shift ended, she should have been allowed to work her former shift on November 6, 2012. (R. 127, Pl.'s Resp. at 5.) The CBA provisions cited by the parties do not specify whether a notice of displacement must be actual or constructive, nor do they explain what happens if a trainman receives notice of a bump after the end of her scheduled shift. Furthermore, the parties offer contrasting views on whether Barren had an obligation to respond to the CMC's voicemail and to have her phone turned on to receive calls. (See R. 109, DSOF ¶¶ 14-17; R. 129, PSOF ¶ 1.)

At any rate, regardless of whether Barren was entitled to payment for November 6, 2012, Metra prevails for other reasons. First, the Seventh Circuit has found that the loss of one day's wages is not substantial enough to qualify as an adverse employment action in the Title VII context. *See Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 505 (7th Cir. 2004); *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 303 (7th Cir. 2004) (non-payment during a disputed work absence is not a quantitative or qualitative change in conditions of employment). Second, even assuming Barren could show that her wage loss or any of Metra's other alleged actions were materially adverse, there is no evidence from which a reasonable jury could conclude that similarly situated non-black or male employees were treated more favorably.

The only evidence of disparate treatment Barren cites to in her response is her testimony that two white male trainmen, David Lipski and Ivan Lewinski, were allowed to use their FMLA leave on more favorable terms and without being subject to investigations or disciplinary action. (R. 129-8, Barren Aff. ¶¶ 7-8.) More specifically, she says that Lipski "was allowed to use FMLA [to] resign[] from his position and was rehired or allowed to return to work[,]" (id. ¶ 7), and that Lewinski was allowed to use FMLA leave by the hour whereas Barren had to use her leave on a whole-day basis, (id. ¶ 8.)

As an initial matter, Barren provides no corroborating evidence to support these statements, nor does she name any similarly situated bumped employee who was not placed on the extra board despite exceeding the six-hour window. *See Bunn*

*v. Khoury Enters., Inc.*, 753 F.3d 676, 685 (7th Cir. 2014) (stating that the similarly-situated "inquiry is too fact-intensive for us to rely on conjecture alone"); *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 841-42 (7th Cir. 2014) ("Without at least a name to test, the district court had no choice but to grant summary judgment."). But even assuming the truth of her bare assertions, Barren's reliance on Lipski is misguided because it is based on the faulty premise that Barren will not be allowed to return to her position because of medical disqualification. As already discussed above, Barren has conceded that being medically disqualified will not prevent her from resuming her position if she passes a physical exam. (R. 109, DSOF ¶ 82.)

As for Lewinski, Barren admitted in her deposition that she did not personally know Lewinski's race or his FMLA status, (R. 111, Barren Dep. Vol. II at 23:11-27:2), so her assertions about his favorable treatment are based purely on inadmissible hearsay at best, *see Schindler v.* Seiler, 474 F.3d 1008, 1011 (7th Cir. 2007). Furthermore, Barren has not shown that Lewinski is "directly comparable" to her "in all material respects . . . with other possible explanatory variables eliminated." *See Hutt v. AbbVie Prods. LLC*, 757 F.3d 687, 692 (7th Cir. 2014) (internal quotation marks omitted); *see also Langenbach v. Wal-Mart Stores, Inc.*, 761 F.3d 792, 803 (7th Cir. 2014) (the similarly-situated analysis is the same under the indirect method as it is under the direct method). In fact, Barren's affidavit only states that Lewinski is a white male conductor. (See R. 129-8, Barren Aff. ¶ 8.) No reasonable jury could find, based solely on Barren's conclusory statement, that her race or sex explains the difference between the terms of Lewinski's FMLA leave

and her own. She has not shown, for example, that Lewinski's serious health condition is comparable to hers in any way, or that his duties as a conductor were similar to her duties as an assistant conductor. She also does not cite to evidence that she requested to take FMLA leave on an hourly basis and was denied. For all these reasons, Barren's proposed comparators fail to support an inference that discrimination may have been a factor in any of Metra's alleged actions.

Even if Barren is able to meet her initial burden of showing a prima facie case, Metra has articulated legitimate, nondiscriminatory reasons for its actions. Barren does not dispute that Metra initially denied her requests for FMLA leave because of a clerical error, (R. 109, DSOF ¶¶ 32-33), and because her FMLA approval did not provide her with time off for her own doctor's appointments, (id. ¶ 69); *see Taylor-Novotny v. Health Alliance Med. Plans, Inc.*, 772 F.3d 478, 498 (7th Cir. 2014) (finding that the denial of a leave request for time falling outside of approved FMLA parameters "did not deny [plaintiff] any right under the FMLA"). In response to Barren's allegation that her return-to-work date was inaccurate, Metra explained its legitimate practice of evaluating employees for medical disqualification after one year of leave and requesting additional documentation from employees' doctors before extending their medical leave. (See R. 109, DSOF ¶¶ 78-79; R. 116-1, Ex. 11, Collins Dep. at 52:5-53:7.) Metra has also explained its decision to initiate investigations into Barren's alleged failure to respond to voicemails and her refusal to accept extra board placement, citing written policies

and telephone recordings as corroboration.[3]  (See R. 109, DSOF ¶¶ 34, 36-38, 50-53, 63-65.)  Specifically, Metra has produced recordings of the voicemails the CMC left for Barren on November 5, 2012, as well as recorded conversations in which Barren refutes her placement on the extra board and then states that she cannot work the assigned shift.  (See id.)  As for asking Barren to recite the emergency exit announcement, Barren does not dispute that trainmen are required to know such announcements and that Metra supervisors regularly conduct efficiency tests.  (Id. ¶¶ 7, 10, 24-25.)  Barren has provided little to no evidence refuting Metra's explanations.  Thus, even if the court assumes Barren has established a prima facie case under the indirect method, her claims still fall short because she fails to cast doubt on Metra's nondiscriminatory reasons for the employment actions she challenges.  *See Naficy v. Ill. Dep't of Human Servs.*, 697 F.3d 504, 512 (7th Cir. 2012).  Given that the evidence Barren has marshalled falls short of creating a genuine dispute of material facts, Metra is entitled to summary judgment on her race and sex discrimination claims.

---

[3]  Barren asserts that Metra's medical department falsified documents related to her return-to-work date.  (R. 41, Am. Compl. ¶¶ 79-84.)  She also alleges that Metra's recordings of CMC calls have been altered or somehow tampered with.  (See R. 110, Barren Dep. Vol. I at 145:13-20.)  But because she offers no evidence in support of her bare assertions, the court disregards them.  *See Rand v. CF Indus.*, 42 F.3d 1139, 1146 (7th Cir. 1994) (inferences must be based on more than "speculation, hunches, intuitions, or rumors," otherwise there would be no summary judgment in discrimination cases); *see also Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005) ("Perfunctory or undeveloped arguments are waived.").

## B.    Retaliation Claims

Barren also claims that Metra's actions constitute retaliation against her for having filed EEOC charges and for having sought FMLA leave.  Title VII prohibits an employer from retaliating against an employee for engaging in protected activity, such as complaining about discrimination in the workplace.  *See* 42 U.S.C. § 2000e-3.  Similarly, an employer cannot retaliate against an employee for exercising her rights under the FMLA.  *See Scruggs v. Carrier Corp.*, 688 F.3d 821, 826 (7th Cir. 2012).  Although a plaintiff may establish a prima facie case of retaliation using either the direct method or the indirect method, Barren chose to proceed under the direct method so the court will apply that framework here.  *See Weber v. Univs. Research Ass'n, Inc.*, 621 F.3d 589, 592 (7th Cir. 2010).  Under the direct method, Barren must present evidence from which a jury could conclude that: (1) she engaged in a statutorily protected activity; (2) she suffered a materially adverse action by her employer; and (3) a causal link exists between the two.  *See Benuzzi v. Bd. of Educ. of City of Chi.*, 647 F.3d 652, 664 (7th Cir. 2011).  The court assumes, as the parties do, that Barren engaged in statutorily protected activity by filing EEOC charges and by requesting FMLA leave.  The court's inquiry thus focuses on the second and third elements.  The Supreme Court has held that Title VII's anti-retaliation provision covers a wider range of employer conduct than the anti-discrimination provision.  *See Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 173 (2011).  Under this broader construction, the pertinent inquiry in a retaliation claim is whether an employer has acted in a way that "well might have dissuaded a

reasonable worker from making or supporting a charge of discrimination." *Burlington N. Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

The alleged adverse employment actions Barren identifies in support of her retaliation claim are the same as those she alleged in her discrimination claims. But even with the more generous standard governing retaliation claims, most of the alleged acts fail to meet the adverse employment action standard. First, the fact that Metra initiated formal investigations is insufficient to make a prima facie retaliation case, especially in light of Metra's legitimate explanation for commencing the investigations. *See, e.g., Nichols v. S. Ill. University-Edwardsville*, 510 F.3d 772, 786-87 (7th Cir. 2007) (finding that initiating an investigation of an employee, even when the employee is placed on paid administrative leave pending its completion, is not a materially adverse action in the retaliation context). Barren has failed to contradict Metra's assertion that medical disqualification is not in fact adverse, (R. 109, DSOF ¶ 82), and as already discussed, Barren has not presented evidence indicating that her disability benefits were delayed. Even if she had, she has not shown what harm she suffered as a result of the alleged delay. *See Dennis v. Potter*, No. 08 CV 198, 2012 WL 8251513, at *16 (N.D. Ind. Mar. 23, 2012) (finding that having to submit additional medical documentation and a delay of one pay period on two occasions do not constitute materially adverse actions in the retaliation context). Similarly, Barren has not articulated how Metra's initial denials of her requests for FMLA leave constitute harms significant enough to rise

to the level of materially adverse actions which would dissuade her from engaging in protected activity.  *See id.*

As for having to recite the emergency exit announcement, Barren admits that knowing the announcement was a job requirement and that efficiency tests are a part of a trainman's training process.  (R. 109, DSOF ¶¶ 7, 10.)  In *Burlington*, the Supreme Court made clear that context matters to the determination of what constitutes a materially adverse action.  548 U.S. at 69.  Here, Barren does not dispute that trainmen are regularly subjected to efficiency tests, and she fails to present any evidence to show that there was anything remarkable about being asked to recite the announcement.  Also, Barren's inability to secure a shift of her choice, as a result of being bumped by a more senior trainman, is unremarkable in that it is consistent with the terms of the CBA to which she agreed to be bound.  (See R. 109, DSOF ¶¶ 6, 12, 19.)  For these reasons, the court concludes that a rational jury could not find that the treatment Barren received would dissuade a reasonable worker from participating in a protected activity.

Barren's placement on the extra board and her loss of wages from November 6, 2012, come closer to qualifying as materially adverse employment actions for purposes of pursuing a retaliation claim.  But as discussed above with respect to Barren's discrimination claims, scheduling changes, *see Peters*, 512 Fed. App'x at 626; *Grube*, 257 F.3d at 729-30, and the loss of one day's wages, *see Rhodes*, 359 F.3d at 505, generally do not constitute materially adverse employment actions.  And despite the broader reach of Title VII's anti-retaliation provision, the Seventh

Circuit has made clear that Title VII does not authorize courts to act as a "super-personnel department intervening whenever an employee feels [she] is being treated unjustly." *Cardoso v. Robert Bosch Corp.*, 427 F.3d 429, 435 (7th Cir. 2005) (internal citations and quotations omitted). The scheduling of an employee's work hours and shifts is a determination made in the ordinary course of business by an employer, *see Beverly v. Kaupas*, No. 05 CV 6338, 2008 WL 624045, at *14 (N.D. Ill. Feb. 29, 2008), and Metra's decisions to place Barren on the extra board and deny her a day's pay because she failed to communicate are facially legitimate, *see Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1007 (7th Cir. 2002) ("courts do not sit as super personnel departments to second guess an employer's facially legitimate business decisions"). As such, the court finds that Barren's short stint on the extra board and her wage loss do not qualify as adverse employment actions.

Even assuming, however, that a reasonable jury could find that Metra's scheduling actions were materially adverse, Barren fails to offer sufficient evidence of a causal connection between Metra's decisions and her EEOC charges and FMLA leave requests. Under the direct method of proof, a plaintiff may offer direct or circumstantial evidence to satisfy the causation element of retaliation. *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720 (7th Cir. 2005). Direct evidence requires something akin to an admission of retaliatory conduct by the employer. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 610 (7th Cir. 2006). Since Barren does not present such evidence, she must instead offer a "convincing mosaic of circumstantial evidence" that, when taken as a whole and viewed in the light most

favorable to Barren's case, could convince a reasonable jury that she was the victim of retaliation. *See Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 643 (7th Cir. 2013). The Seventh Circuit lists the following categories of circumstantial evidence from which a plaintiff can build that mosaic: "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Id.* at 643-44 (quotation and citation omitted).

Aside from making a vague reference to "other evidence" indicating a causal connection between her protected activities and Metra's alleged adverse actions, Barren appears to rely solely on timing to satisfy the causation element. (R. 127, Pl.'s Resp. at 6-7.) Her reliance is misguided for a few reasons. First, suspicious timing is rarely sufficient by itself to create a triable issue. *See Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012). To survive summary judgment, a plaintiff must point to other evidence that supports the inference of a causal link beyond close temporal proximity. *See Lang v. Ill. Dep't of Children & Family Servs.*, 361 F.3d 416, 419 (7th Cir. 2004). Second, for a suspicious-timing argument alone to give rise to an inference of causation, the plaintiff must demonstrate not only that an adverse employment action followed "close on the heels" of the protected activity, but also that the person who decided to impose the adverse action knew of the protected activity. *Lalvani v. Cook Cnty.*, 269 F.3d 785, 790 (7th Cir. 2001).

Here, Barren does not even address Metra employees' knowledge in her statement of additional facts or her brief and fails to identify evidence regarding who knew what and when about her protected activities. *See Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 675 (7th Cir. 2011) ("A claim of retaliation based on suspicious timing depends on what the relevant decision-makers knew and when[.]"). Third, as already discussed above, Metra has provided reasonable explanations for why it acted as it did with respect to scheduling and Barren's requests for FMLA leave. Accordingly, Barren's temporal proximity argument fails.

Metra does admit that Carbonelli told Barren during a meeting the week of November 7, 2012, that occasionally the demands of Barren's job may not allow her to attend to personal matters. (R. 109, DSOF ¶ 62.) Setting aside the fact that Barren makes no mention of this remark in her brief or statement of additional facts, Carbonelli's comment is far from an admission of retaliatory motive. According to Barren, Carbonelli made that statement during a discussion about Barren's refusal to take an assignment from the extra board because she was at her mother's house "dealing with things." (R. 110, Barren Dep. Vol. I at 141:7-145:2; 161:4-18.) Even if an inference of bias could be read into Carbonelli's comment, nothing about the context surrounding the remark suggests that retaliatory motive played a role in the decision to place Barren on the extra board. And at any rate, an isolated comment standing alone is insufficient to overcome summary judgment. *See Fleishman v. Continental Cas. Co.*, 698 F.3d 598, 604-05 (7th Cir. 2012); *see also Hobgood*, 731 F.3d at 644 ("[A] reasonable jury could not infer that a plaintiff was a

victim of illegal discrimination or retaliation based on one isolated 'bit' or 'piece'."). Barren's evidence is therefore insufficient to survive summary judgment on her retaliation claims under the direct method.

## C.     ADA Claim

Barren next claims that Metra discriminated against her on the basis of her mental illness, by delaying her benefits and placing her on medically disqualified status. (R. 41, Am. Compl. ¶¶ 79-84.) The ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of [her] disability" in regard to the terms, conditions, and privileges of employment. 42 U.S.C. § 12112. To establish a violation of the ADA, Barren must show: (1) that she is disabled; (2) that she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) that Metra took an adverse job action against her because of her disability or failed to make a reasonable accommodation. *See Stevens v. Ill. Dep't of Transp.*, 210 F.3d 732, 736 (7th Cir. 2000) (citations omitted). While the parties do not dispute that Barren is disabled, Metra contends that her claim fails under the second and third prongs. (R. 108, Def.'s Mem. at 15.) The court agrees. For reasons already discussed, Barren has not shown that Metra took an adverse job action against her. Furthermore, her assertion that she can perform her job duties with or without accommodation is belied by the fact that she has been out on medical leave since November 20, 2012. (See R. 109, DSOF ¶ 70.) In her opposition brief, Barren does not argue that she is fit to return to work or that she requested to do so and was denied. Rather, she accuses Metra of failing to

participate in an interactive process with her because, according to Barren, medical disqualification is something she neither desired nor requested. (R. 127, Pl.'s Opp. at 7.) But she bases her argument on an admitted misunderstanding of medical disqualification as a bar on her returning to work. Specifically, she concedes that the medical disqualification does not prevent her from returning to work as long as she passes a physical examination. (R. 109, DSOF ¶ 81.) In short, there is insufficient evidence in the record to support Barren's ADA claim.

**D.     Breach of Contract Claim**

Lastly, Barren asserts that Metra breached the Mediation Agreement by failing to: (1) issue "special written instructions" to the CMC regarding requests for FMLA leave; (2) schedule a discussion with Metra's medical department and Barren about each party's responsibilities regarding FMLA paperwork; (3) ensure that Barren's FMLA requests are processed in a timely manner consistent with FMLA regulations and Metra policies; and (4) remind the medical department that employees' medical issues are confidential. (See R. 109, DSOF ¶ 30; R. 129, PSOF ¶¶ 16-20; R. 77, Suppl. Compl., Ex. 1.) In order to establish a case for breach of contract under Illinois law, Barren must present evidence to show: (1) the existence of a valid and enforceable contract; (2) her performance of all required contractual conditions; (3) Metra's breach of the terms of the contract; and (4) damages resulting from the breach. *See Lindy Lu LLC v. Ill. Cent. R.R. Co.*, 2013 IL App (3d) 120337, P21 (2013). Metra does not contest the first two elements, but argues that

Barren cannot show that it breached the Mediation Agreement or that she suffered damages as a result. (See R. 108, Def.'s Mem. at 15.)

Only one sentence in Barren's brief directly responds to Metra's breach-of-contract arguments, and that sentence makes a vague reference to evidence "stated earlier, pursuant to the record" and damages in the form of "at least one unpaid day off." (See R. 127, Pl.'s Opp. at 9.) General averments without factual support in the record will not defeat a motion for summary judgment. *See Jones v. Merchants Nat'l Bank & Trust Co.*, 42 F.3d 1054, 1058 (7th Cir. 1994). Moreover, Barren cites no affirmative evidence supporting her allegations that Metra failed to issue special instructions, schedule a discussion regarding FMLA paperwork, or remind the medical department about confidentiality. Instead, she relies entirely on the *absence* of evidence that Metra met its obligations. (See R. 129, PSOF ¶¶ 15-20.) Barren's reliance is misguided, however, because although Metra has the burden of showing there is no genuine issue of fact, Barren is not relieved of her own burden of producing affirmative evidence that would support a jury verdict in her favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). This remains true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had an opportunity to complete discovery. *Id.* Here, Barren does not deny that she had the full benefit of discovery, including the opportunity to depose Metra employees in the medical department. And although she submitted an affidavit, she did not attest therein that Metra failed to hold a discussion with her about FMLA paperwork as required by the Agreement, even

though she presumably has personal knowledge of whether the discussion took place. (See R. 129-8, Barren Aff.) Nor does she direct the court's attention to any of her own testimony, or testimony from Metra employees, from which a fact-finder could reasonably infer that Metra did not give special instructions to the CMC or remind its medical department about the importance of maintaining confidentiality. Barren makes much of the fact that Metra has no conclusive evidence proving it issued "special" instructions, (R. 128, Pl.'s Resp. to DSOF ¶ 30), but it is Barren's burden to produce affirmative evidence of Metra's alleged breaches—a burden Barren fails to carry, *see Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 75 (2006); *Chrysler Credit Corp. v. Anthony Dodge, Inc.*, No. 92 CV 5273, 1996 WL 509886, at *10 (N.D. Ill. June 21, 1996) (granting summary judgment to defendant where plaintiff offered "no evidence whatsoever" proving defendant's breach).

Barren gains some traction, however, with her assertion that Metra has failed to ensure that her FMLA requests are processed in a timely manner consistent with FMLA regulations and Metra policies. She claims that the initial denials of her requests for FMLA leave on September 28 and November 20, 2012, are evidence of Metra's breach. First, Metra admits that although it approved Barren's request for intermittent FMLA leave in early September 2012, the CMC did not receive notice of that approval until almost a month later on October 3, 2012, because of a clerical error. (R. 109, DSOF ¶ 32.) Second, Barren testified that she gave Metra two months' notice of her November 20, 2012 doctor's appointment. (See R. 110, Barren Dep. Vol. I at 74:17-75:8.) When an employer has enough

information to determine whether requested leave is being taken for a FMLA-qualifying reason, the employer must notify the employee whether the leave will be counted as FMLA leave within five business days absent extenuating circumstances. 29 C.F.R. § 825.300(d). If the employer determines that the leave will not be designated as FMLA-qualifying (e.g., if the leave is not for a reason covered by FMLA), the employer must notify the employee of that determination. *Id.* Here, Metra contends that it initially denied Barren's request for leave to cover her November 20, 2012 appointment, because medical appointments fell outside of her FMLA approval. (R. 109, DSOF ¶ 69.) But assuming the truth of Barren's testimony, Metra knew that Barren was requesting leave for a doctor's appointment two months ahead of time and yet did not notify her of its decision to deny her request until the day of her requested leave. (See R. 128, Pl.'s Resp. to DSOF ¶ 69.) Accordingly, Barren has produced sufficient evidence to create a genuine dispute as to whether Metra breached its obligation to timely process her FMLA requests.

That being said, Barren's breach of contract claim nonetheless fails because there is insufficient evidence to show she suffered damages resulting from any alleged breach. She argues that she suffered damages in the form of "at least one unpaid day off," (R. 127, Pl.'s Opp. at 9), but fails to present any evidence to show that any wage loss resulted from Metra's breach of the Mediation Agreement. For example, she has not shown how Metra's alleged failure to timely process her FMLA requests or to properly enforce its FMLA policies somehow prevented her from working or being paid on November 6, 2012, the day she claims she lost wages.

Barren also alleges that she suffered emotional distress and "emotional damages." (See, e.g., R. 41, Am. Compl. ¶¶ 53, 70; R. 77, Suppl. Compl. ¶ 87.) Under Illinois law, emotional distress damages are generally unavailable in breach of contract claims except where the breach was wanton or reckless and caused bodily harm, or where the defendant had reason to know that its breach would cause mental suffering. *See Parks v. Wells Fargo Home Mortg., Inc.*, 398 F.3d 937, 940 (7th Cir. 2005) (citing *Maere v. Churchill*, 116 Ill. App. 3d 939, 944 (1983)). Here, there is no evidence that Metra acted wantonly or recklessly, and Barren does not allege that she suffered physical injuries. And even if Metra had reason to know that emotional distress would be a likely result of its breach, the record indicates only that Barren was "stunned" and "upset" by Metra's initial denials of her requests for FMLA leave. (See R. 110, Barren Dep. Vol. I at 72:15-76:13.) Such vague testimony regarding emotional distress is generally insufficient to overcome summary judgment in cases where such damages are available. *See, e.g., Diedrich v. Ocwen Loan Servicing, LLC*, No. 13 CV 693, 2015 WL 1885630, at *9 (E.D. Wisc. Apr. 24, 2015) (finding that while plaintiffs need not prove emotional distress with expert testimony or documentary evidence, their testimony that they experienced 'stress' and 'worry' based on 'everything' defendant had done was conclusory and vague); *cf. Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 696 (7th Cir. 2011) (denying summary judgment on breach of contract claim where plaintiffs' testimony was not conclusory and "described their emotional turmoil in reasonable detail").

Barren admits that her FMLA requests were ultimately granted and that she was not subject to any discipline as a result. (See id.; R. 109, DSOF ¶¶ 33, 69.) Furthermore, Barren has not even alleged, let alone presented evidence, that she was injured because the CMC made improper comments relating to her FMLA leave or because the medical department violated the confidentiality of her condition. Barren bears the burden of proving that she sustained damages resulting from Metra's alleged breach and establishing both the correct measurement of damages and the final computation of damages based on that measurement. *See Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 518 (7th Cir. 2011) (applying Illinois law) (citations omitted). Because she failed to do so here, Metra is entitled to summary judgment on her breach of contract claim.

## Conclusion

For the foregoing reasons, Metra's motion for summary judgment is granted.

**ENTER:**

_____
**Young B. Kim**
**United States Magistrate Judge**